# UNITED STATES DISTRICT COURT
Eastern District of Wisconsin

SARA AND JOSEPH HARMON,

    Plaintiffs,

v.                               Case No. 18cv209-JPS

THE CITY OF RACINE, SGT. RYAN
COMSTOCK, INV. CHAD STILLMAN,
INV. DONALD NUTTALL,
SGT. ROBERT THILLEMANN,
in their individual capacities,

    Defendants.

# First Amended Complaint

## I. NATURE OF ACTION

The Harmons bring this civil action under Title 42 U.S.C. §1983 against the City of Racine in order to obtain damages and other appropriate relief for the unlawful search which culminated in the unlawful seizure and slaughtering of their dog, Sugar, in violation of rights secured to them by the Fourth and Fourteenth Amendments to the Constitution of the United States.

## II. JURISDICTION AND VENUE

### A. Jurisdiction

201. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (42 U.S.C. § 1983 jurisdiction).

### B  Venue

202. The Eastern District of Wisconsin is the proper venue for this action because the Plaintiff's claims arose within the geographical boundaries of the Eastern District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III. PARTIES

### A. Plaintiff

301. The Plaintiffs, Sara and Joseph Harmon, are adult residents of the State of Wisconsin with the capacity to sue and be sued in this Court.

### B  Defendants

301. The Defendant City of Racine is a Wisconsin unit of local government, with a principal address of 730 Washington Avenue, Racine, Wisconsin, with the capacity to sue and be sued in this Court.

302. Defendant Sgt. Ryan Comstock is an adult resident of the State of Wisconsin, with the capacity to sue and be sued. At all times pertinent, Sgt. Comstock was employed by the Racine Police Department and acting within his scope of employment and under the color of law.

303. Defendant Inv. Chad Stillman is an adult resident of the State of Wisconsin, with the capacity to sue and be sued. At all times pertinent, Inv. Stillman was employed by the Racine Police Department and acting within his scope of employment and under the color of law.

304. Defendant Inv. Donald Nuttall is an adult resident of the State of Wisconsin, with the capacity to sue and be sued. At all times pertinent, Inv. Nuttall was employed by the Racine Police Department and acting within his scope of employment and under the color of law.

305. Defendant Sgt. Robert Thillemann is an adult resident of the State of Wisconsin, with the capacity to sue and be sued. At all times pertinent, Sgt. Thillemann was employed by the Racine Police Department and acting within his scope of employment and under the color of law.

## IV. ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

401. On or about November 28, 2016, Investigator Chad Stillman filed a sworn Affidavit for Search Warrant with the Racine County Circuit Court, requesting that the court issue a No Knock Search Warrant for the Plaintiffs' home to investigate a shots

fired incident in which the Plaintiffs' then minor child, Jordan Harmon, was alleged to have been involved.

402. Inv. Stillman knew or should have known that a warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes untrue statements in the request, or fails to include in the request statements that would negate probable cause to support the warrant.

403. Inv. Stillman nonetheless did knowingly, intentionally, or with reckless disregard for the truth, makes untrue statements in the request, and failed to include statements that would have negated any probable cause to support the warrant.

404. For example, Inv. Stillman knew, but did not inform the court, that the alleged victim of the shots fired incident reported on November 15, 2016, that he saw the alleged suspect who had a similar skin color to Jordan Harmon, but that he did not believe it actually was Jordan Harmon, a person whom the victim would have been able to recognize from prior contacts.

405. Additionally, Inv. Stillman told the court in his Affidavit that he was relying on a sole witness who reported on November 23rd that Jordan Harmon was involved in the shots fired incident.

406. Inv. Stillman knew that statements that were made by the sole informant were unreliable and uncorroborated were not likely to support probable cause.

4

407. So, to induce the court to issue a finding of probable cause, Inv. Stillan intentionally omitted the material facts that tended to prove that this witness was unreliable.

408. Examples of facts that Inv. Stillman knew, but intentionally omitted in his Affidavit for Search Warrant, because they tended to negate probable cause, include, but are not limited to, the following:

- The informant was a known and documented gang member;

- The informant was a juvenile with felony convictions;

- The informant was present at the shots fired incident, and fled from police and ran toward his home when police arrived at the scene of the shots fired incident;

- A .40 caliber stolen handgun was located on the basement stairs of the informant's locked home just after the shots fired incident;

- A .40 caliber magazine matching the stolen handgun was located under a couch cushion in the living room of the informant's locked home just after the shots fired incident;

- The stolen .40 caliber handgun located in the informant's home was consistent with the .40 caliber bullet casings found at the shots fired scene;

- The informant had no explanation for how this stolen handgun and matching magazine could have possibly gotten into his locked home;

- The informant changed his story of what had occurred earlier that evening several times during his interrogation on the night of the November 15th shots fired incident;

- The informant's statements during his November 23rd interview which implicated Jordan Harmon were in direct conflict with his prior statements during his November 16th interview.

5

409. Because Inv. Stillman made false statements and material omissions in his Affidavit for Search Warrant, including falsely inflating the reliability of his sole informant and omitting material facts that would have tended to exonerate Jordan Harmon (and would instead have implicated the informant who was pointing fingers at Jordan Harmon), the Search Warrant was issued by the court.

410. Had Inv. Stillman disclosed those material facts to the court, the court would likely not have found probable cause, and therefore would not have issued the warrant.

411. On or about November 30, 2016, Investigator Chad Stillman held a briefing regarding the search warrant to be executed at the Harmons' residence.

412. Inv. Stillman informed the officers present at briefing that there might be a large dog present in the Harmon's home.

413. Inv. Donald Nuttall was assigned to the Team Leader position.

414. Defendants Stillman and Nuttall had command responsibility for this search, knew that any dog present would be shot pursuant to Racine protocol, and could have, but did not intervene in any way to ensure that the Harmon's friendly pet dog would not be shot.

415. Sgt. Ryan Comstock was assigned to be the point person – or the first officer to lead the team into the home.

416. The Harmon family did in fact own a 60-pound pet dog named Sugar.

417. Sugar was a friendly, two-year-old, fully vaccinated American Bulldog in good health.

6

418. At approximately 5 a.m. on November 30th, Racine Police Officers executed the search warrant.

419. On information and belief, the officers chose the hour of 5 a.m. because they believed that Mr. and Mrs. Harmon were likely to be at work at that time.

420. Sgt. Ryan Comstock was the first officer to enter the Harmon's home.

421. Among all of the tools and less lethal options available to police officers, Sgt. Comstock was armed with a department issued M4 assault rifle.

422. The M4 assault rifle is a modern version of the M16 military assault rifle. The M4 assault rifle is an extremely accurate and lethal weapon.

423. Sgt. Robert Thillemann entered right behind Sgt. Comstock.

424. At the time Sgt. Comstock entered, Sugar was resting on the couch.

425. Upon entry, Sgt. Comstock observed Sugar jump off the couch and run away, down the hallway to the left.

426. Sgt. Comstock followed the same path Sugar had taken, and observed that Sugar had run into the bedroom at the end of the hallway

427. Sgt. Comstock did not simply shut the door to contain Sugar in the bedroom.

428. Defendant Thillemann was immediately next to Sgt. Comstock, and could have stopped Sgt. Comstock from shooting, but did not.

429. Defendant Thillemann wrote in his report, "I heard Sgt. Comstock announce that he saw the dog and that i[t] was going to the left toward some other rooms. I followed Sgt. Comstock to the mentioned area. As we entered the hallway

7

area where the dog was last seen going I observed a closed door on the right and an open door to a bathroom in the middle of the hallway. I stayed with Sgt. Comstock to cover him from the possible problem areas of the mentioned doors as he continued to the left. At approximately that same time I heard three shots come from behind me where Sgt. Comstock was evaluating the bedroom from the threshold of the bedroom."

430. Sgt. Comstock chose to use his department issued M4 assault rifle to fire three shots at Sugar.

431. Sgt. Comstock fired those three shots while Sugar was facing away from the officer.

432. Sugar never growled or barked or acted aggressively in any way.

433. Wounded and bleeding, Sugar then jumped onto bed.

434. On information and belief, in pain and in fear, Sugar wet the bed.

435. Sgt. Comstock shot Sugar a fourth time, while she was wounded and bleeding on the bed.

436. Finally, after Sugar suffered for a period of time, Sgt. Comstock fired a fifth bullet directly into Sugar's head to ensure her speedy death.

437. Defendant Thillemann encouraged Sgt. Comstock to fire the fatal shot, even though the dog was not threatening anyone.

438. Defendants Stillmann and Nuttall were present in the home by this point, and could have intervened to stop Sgt. Comstock from shooting before he caused Sugar's death, but they failed to intervene in any way.

8

439. Defendant Thillemann wrote in his report: "While covering the dog I could see that the dog was shot just behind the head in the neck area on the right side of it's [sic] body. The dog's breathing appeared to get more and more labored as time had passed. I observed the dog had fatal wounds and obvious rapid deteriorating health. I then mentioned this observation to Sgt. Comstock. A few moments later it was decided in order to keep the dog from suffering any further the dog should be dispatched to keep it from suffering any further. Sgt. Comstock then stepped forward and delivered one final shot to the dog's head which immediately incapacitated the dog. I then exited the residence without further incident."

440. Two minor children were present in the home at this time, but luckily, neither was physically injured by the bullets fired.

441. At least one bullet did pass through a wall and into the adjacent room.

442. On information and belief, the officers found no evidence of illegal activity during their search of the Harmon's home, and the search led to no citations or arrests.

443. Upon Mr. Harmon returning home, Inv. Stillman informed Mr. Harmon that Sugar was shot pursuant to Department "protocol."

444. Following the shooting of the Harmon's dog, the Racine Police Department was contacted by at least one reporter and at least one concerned citizen questioning the use of force against the family dog.

445. Therefore, Chief Howell directed that a review be completed.

9

446. The Racine Police Department issued a determination, through Sgt. Bebow, that Sgt. Comstock's shooting and killing of Sugar Harmon was consistent with Racine's official policy.

447. On information and belief, between 2014-2015, the two years leading up to the 2016 shooting complained of herein, the Racine Police Department executed eight warrants at premises where a dog was present, and shot those dogs during the execution of six of those warrants – or approximately 75% of all dogs encountered during planned search warrant executions, in violation of citizens' rights.

448. On information and belief, all the dogs that were shot were shot to death.

449. On information and belief, the City knew that the majority of dogs encountered during warrants were being killed in violation of citizens' rights, and the City was deliberately indifferent.

450. For example, Melissa Hernandez made a complaint to the City that her dogs were unreasonably shot in 2015 following a no knock warrant that was served on her home.

451. Ms. Hernandez informed the Racine Police Department on or about June 29, 2015, that Racine police had recently kicked down her door, started shooting multiple times, and then, only after shooting, announced that it was police.

452. Ms. Hernandez complained that there were kids home at the time.

453. Ms. Hernandez complained that the officers opened fire before even fully entering the home.

454. Ms. Hernandez complained that her dog was killed while he was sleeping on his dog bed, and the dog never got up prior to the shooting.

455. Ms. Hernandez complained that she had just given her dog a kiss as she was getting ready for work and he slept on his dog bed, and that he was still sleeping on his dog bed when he was shot.

456. Ms. Hernandez complained that after her sleeping dog was shot, her other dog started to walk out from the back room to see what was going on, and instead of giving her a chance to grab that dog, police simply started shooting at that second dog.

457. Lt. Chuck Weizel of the Racine Police Department, who was taking Ms. Hernandez's complaint, informed Ms. Hernandez that it was routine procedure, saying, "With a no knock search warrant, they *will not* give you an opportunity" to grab your dog prior to shooting.

458. Ms. Hernandez complained that police took her dead dog and disposed of him in a garbage truck.

459. Ms. Hernandez complained that she asked police if she could just at least keep the collar, and police told her no.

460. Lt. Weizel told Ms. Hernandez that this was routine procedure for the Racine Police Department, saying that they always take the dead dog and never give it back to the owner.

461. Lt. Weizel told Ms. Hernandez that it was his job to determine if there was a policy violation.

11

Case 2:18-cv-00209-JPS   Filed 06/13/18   Page 11 of 19   Document 28

462. When taking Ms. Hernandez's complaint, and prior to investigating it, Chuck Weizel told Ms. Hernandez that if she felt police did something wrong, she would have to get an attorney, because in his view, police did nothing wrong and they would defend themselves in court.

463. Lt. Weizel told Ms. Hernandez that police expect a dog will act aggressively when police kick down a door, and Racine policy is that if a dog is showing aggressive behavior, they can kill him.

464. Ms. Hernandez insisted that her dogs did not act aggressively.

465. The Racine Police Department determined that no interview of the shooting officer would be necessary based on Ms. Hernandez's citizen complaint.

466. Racine Police Department determined that the shooting of Ms. Hernandez's dogs was consistent with Racine policy, and that no violation of policy was found.

467. Lt. Weizel did, however, say he would be willing to get to the bottom of Ms. Hernandez's allegation that someone from the police department had spoken rudely to her on the telephone.

468. On information and belief, other friendly, non-threatening dogs that Racine PD came into contact with in circumstances other than planned warrant executions were shot to death, in violation of citizens' rights.

469. On information and belief, the City knew of these other friendly, non-threatening dogs being killed by the Racine Police Department in violation of citizens' rights, and was deliberately indifferent.

470. For example, in November of 2014, Racine police shot a friendly, non-threatening dog in the back, while investigating a dispute between neighbors stemming from one neighbor's alleged failure to pick up some dog feces.

471. That November 2014 dog shooting by Racine police was captured on video and can be seen here: https://www.youtube.com/watch?v=pgJS8jMwlqo (last accessed 6/8/17).

472. That dog's name was Angel, and she belonged to Kurt Hanson.

473. Many citizens filed complaints with Racine PD regarding Angel's death. There were 10 or more complaints filed by citizens who felt this shooting was unreasonable.

474. The Racine Police Department, by and through Sgt. Bebow, approved Racine's shooting and killing of Angel as consistent with Racine policy.

475. On information and belief, these officers who killed friendly, non-threatening dogs were not disciplined or retrained.

476. By way of example, in February of 2014, Officer Ortiz shot a friendly pet dog that had not acted aggressively at all, and, on information and belief, he was not disciplined, counseled, or retrained. Officer Ortiz wrote in his report, "a white pit bull made its way around a corner to where we were standing. It initially walked toward us, then backed up. After about a second or two, it proceeded to walk towards us again it [sic] a fast walk manner. Not knowing the dogs intentions and fearing for the safety of the team, I shot 2 rounds from my M-4 rifle towards the dog. It was dazed but took

13

another step towards the team, so I proceeded to shoot 4 additional shots from my M-4 rifle at the dog."

477. For another example, Sgt. Comstock himself shot a dog in October, 2015, during the execution of a no knock search warrant. That dog nudged a door open, came out looking confused, and was shot to death. Sgt. Comstock was not disciplined, counseled, or retrained.

478. On information and belief, it was quite foreseeable that Racine Police Officers would come into contact with dogs, yet the City:

   a. failed to provide constitutionally adequate training in light of these foreseeable circumstances, and the foreseeable consequences of a lack of training, which were that the police officers would often shoot the dogs they encountered, and

   b. failed to act in response to repeated constitutional violations by its officers.

479. The Plaintiffs currently own a pet dog and reasonably fear that their rights and the rights of all Racine citizens who own pet dogs will be continued to be violated until the Racine Police Department employees stop routinely shooting pet dogs when their duties take them into people's homes.

## V. VIOLATIONS OF LAW

### A. Fourth and Fourteenth Amendments

14

Case 2:18-cv-00209-JPS   Filed 06/13/18   Page 14 of 19   Document 28

501. Defendant Comstock used excessive force and conducted an unreasonable seizure when he shot the Harmon's dog, in violation of their constitutional rights under the Fourth Amendment to be free from unreasonable seizures and excessive force.

502. Defendants Comstock, Thillemann, Nuttall, and Stillman acted unreasonably because any danger Defendants felt they faced was created by their own unreasonable conduct in failing to have a plan to address the dog whose presence was known prior to the execution of the warrant.

503. Defendants Thillemann, Nuttall, and Stillman intentionally failed to intervene during the unreasonable use of force and seizure, wrongly depriving the Harmons of their right to be free from unreasonable seizures guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

504. Defendant Stillman knowingly, intentionally, or with reckless disregard for the truth, made untrue statements in an Affidavit for Search Warrant, and failed to inform the court of information he knew that would have negated probable cause to support the warrant, in order to unlawfully procure a search warrant that was not supported by probable cause, wrongly depriving the Harmons of their right to be free from unreasonable seizures guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

### B. Municipal Liability

#### 1. Based on Statutory Indemnification

504. Defendant City of Racine is liable to defend this action against the Defendants, and to satisfy any judgment entered against them, by virtue of Wis. Stat. § 895.46.

#### 2. Based on an Unlawful Municipal Custom or Policy

505. Defendant City of Racine is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because it had a widespread practice and policy of unreasonably killing pet dogs in violation of the rights of its citizens.

506. Defendant City of Racine is liable under *Monell* because it had an official policy and protocol to shoot and kill pet dogs in violation of the rights of its citizens.

507. Defendant City of Racine is liable under *Monell* because it necessarily had knowledge or notice that illegal dog killings were occurring at the hands of its police officers and was deliberately indifferent to the obvious need for retraining of its officers, which led to the deprivation of the plaintiffs' constitutional rights.

## VI. DAMAGES and EQUITY

### A. Damages

601. By virtue of unlawful actions alleged above, the Harmons have endured pain, suffering, emotional distress, financial losses, and other damages for which she should be compensated in an amount deemed just by the Court.

602. Because the acts of the individual Defendants herein alleged were carried out maliciously or with reckless disregard for the Plaintiffs' fundamental rights, the Plaintiffs seek awards of punitive damages against the individual Defendants to deter them and others similarly situated from similar wrongful acts in the future.

### B. Equity.

603. Because it is so obvious that friendly pet dogs will continue to die unconstitutional deaths at the hands of the Racine Police Department unless the City of Racine changes its official policy, practice, protocol, and training regarding the dogs police encounter, for which Plaintiffs have no plain, adequate, or speedy remedy at law, therefore invokes the Court's equitable jurisdiction to award declaratory or injunctive relief against the City of Racine.

## VII. CONDITIONS PRECEDENT

701. All conditions precedent to this action, within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII. DEMAND FOR JURY TRIAL

702. The Plaintiff hereby demands a trial by jury of all issues triable of right to a jury.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant judgment against the Defendant, awarding:

801. Monetary damages in an amount that will fairly compensate the Plaintiffs for their injuries;

802. Punitive damages in amounts that will justly punish the individual Defendants for their actions;

803. A permanent injunction enjoining the Defendant City of Racine and its personnel from continuing to carry out the unconstitutional practice and protocol of shooting pet dogs on sight as a matter of course when carrying out the execution of a search warrant or other high level tactical operation, and requiring the City to provide training to its officers on non-lethal options for detaining a pet dog when necessary to complete

an operation, or equivalent declaratory relief;

803. Costs, attorneys' fees and litigation expenses as well as any further relief this Court deems just.

Dated this Tuesday, June 12, 2018.

Respectfully submitted,

Sara and Joseph Harmon,

Plaintiffs,

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar No. 1016284
ANDREA J. FARRELL
State Bar No. 1064773
131 W. Wilson St., Suite 1200
Madison, WI 53703
Phone:    (608) 283-6001
Facsimile:    (608) 283-0945
E-mail:    jsolson@scofflaw.com
        ajf@scofflaw.com

/s/ Andrea J. Farrell
_____
ANDREA J. FARRELL
ATTORNEYS FOR PLAINTIFF